**Certiorari Granted, July 20, 2012, No. 33,693**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-075**

**Filing Date: May 29, 2012**

**Docket No. 30,380**

**CITY OF ALBUQUERQUE,**

**Plaintiff-Appellee,**

**v.**

**PANGAEA CINEMA LLC d/b/a**
**GUILD CINEMA LLC, and**
**KEIF HENLEY, Registered Agent,**

**Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Carl J. Butkus, District Judge**

City of Albuquerque
Robert D. Kidd, Jr., Interim City Attorney
John E. DuBois, Assistant City Attorney
Albuquerque, NM

for Appellee

ACLU of New Mexico
Laura Schauer Ives
Albuquerque, NM

Bach & Garcia LLC
George Bach
Albuquerque, NM

Kari Morrissey
Albuquerque, NM

for Appellants

**OPINION**

**CASTILLO, Chief Judge.**

**{1}** The Guild Cinema (the Guild), a locally owned art-house movie theater in the Nob Hill neighborhood of the City of Albuquerque (the City), was prosecuted under the City's zoning regulations covering adult amusement establishments for showing one pornographic film during a weekend festival of X-rated fare. The Guild argues that the City's crackdown on the showing of just one adult film outside of a zone designated for adult entertainment violates a mainstream theater's free-speech rights by misusing an ordinance that is unconstitutionally vague and unfairly applied in this instance. We conclude that the ordinance is not vague and was not unconstitutionally applied, and we affirm.

## I. BACKGROUND

**{2}** The parties stipulated to the facts before the district court. Pangaea Cinema, LLC does business as a single-screen movie theater known as the Guild Cinema in the Nob Hill neighborhood of the City along East Central Avenue. Although its most common fare consists of independent feature films and documentaries, in November 2008 the Guild played host to its second annual "Pornotopia" festival, a weekend slate of erotic films. During the festival's second day, two code enforcement officers for the City attended two film screenings. The officers, one male and one female, both concluded that one of the films, "Couch Surfers: Trans Men in Action," met the definition of an adult film under the City's Zoning Code (the Code). Albuquerque, N.M., Zoning Code ch. 14, art. XVI (2008, as amended through 2011). A specific ordinance within the Code, Albuquerque, N.M., Rev. Ordinances ch. 14, art. XVI, § 14-16-1-5(B) (the Ordinance) allows adult films to be shown only in specified zones of the City and prohibits the public screening of such films in all other areas, including the business district of Nob Hill where the Guild is situated. A criminal complaint was filed charging the Guild with operating as an adult amusement establishment outside of an area zoned for such activity. The Guild concedes that the film it showed featured "specified anatomical areas" and "specified sexual activities" as defined by the Ordinance. The City acknowledges that the exhibition of one adult film did not cause negative secondary effects, such as criminal activity. Affidavits filed by some of the Guild's commercial neighbors reported positive effects from the event, in particular, increased business at their establishments during that weekend.

**{3}** The Guild was convicted in metropolitan court, and it appealed to district court. The parties stipulated to facts and exhibits, and they agreed to forgo a trial and agreed instead to have the matter decided on the Guild's motion to dismiss the charge. The district court affirmed the findings of the metropolitan court, upheld the conviction in a thirty-one-page opinion, and fined the cinema $500 for the infraction. The Guild filed a motion for reconsideration that was denied by the district court. This appeal followed.

## II. DISCUSSION

2

**{4}**     The Guild argues that it should not be categorized as an adult amusement establishment under what it considers to be the City's unconstitutionally vague Ordinance and that, because no secondary effects resulted from the showing of the film, the City exceeded its zoning authority by impermissibly targeting the content of the Guild's speech in violation of the theater's free-speech rights.  We take those three arguments in turn, and we review them de novo.  *See Gomez v. Chavarria*, 2009-NMCA-035, ¶ 6, 146 N.M. 46, 206 P.3d 157 (stating that constitutional questions and issues of statutory construction are reviewed de novo).

**A.     The Ordinance Need Not Be More Narrowly Construed**

**{5}**     The Guild first asks us to avoid the constitutional issues and find that a close reading of the City's Ordinance leads to the conclusion that the Ordinance does not apply to the Guild's screening of a single adult film.  The Ordinance reads, in pertinent part:

> **ADULT AMUSEMENT ESTABLISHMENT.**  An establishment such as an auditorium, bar, cabaret, concert hall, nightclub, restaurant, *theater*, or other commercial establishment *that provides* amusement or *entertainment featuring* one or more of the following:
>
> (1)     A live performance, act or escort service distinguished or characterized by an emphasis on the depiction, description, exposure, or representation of specified anatomical areas or the conduct or simulation of specified sexual activities; or
>
> (2)     Audio or video displays, computer displays, *films, motion pictures*, slides or other visual representations or recordings characterized or *distinguished by an emphasis on* the depiction, description, exposure or representation of *specified anatomical areas or the conduct or simulation of specified sexual activities*.

Albuquerque, N.M., Rev. Ordinances § 14-16-1-5(B) (emphasis added).  Another applicable ordinance states:  "Any use not designated a permissive or conditional use in a zone is specifically prohibited from that zone, except as otherwise provided herein."  Albuquerque, N.M., Rev. Ordinances ch. 14, art. XVI, § 14-16-1-3(B) (1980).

**{6}**     When interpreting an ordinance, we look to its language:  "If the language makes the [ordinance] understandable and sensible, that is all that is necessary to uphold it as valid."  *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 34, 137 N.M. 687, 114 P.3d 367 (internal quotation marks and citation omitted).  "Legislative intent is determined primarily from the language of the statute and from the legislative purpose to be achieved."  *State v. Andrews*, 1997-NMCA-017, ¶ 5, 123 N.M. 95, 934 P.2d 289 (citation omitted).  "In order to construe faithfully what the Legislature meant[,] . . . we consider the plain meaning of the words used in the context of the statutory text as a whole."  *Quynh*

*Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (citation omitted). "A statute is read literally if its words are plain and unambiguous, provided such a construction would not lead to an injustice, absurdity, or contradiction." *Andrews*, 1997-NMCA-017, ¶ 5.

**{7}** In the case before us, the portion of the Ordinance italicized above defines an adult amusement establishment, in one instance, as a "theater . . . that provides . . . entertainment featuring . . . motion pictures . . . distinguished by an emphasis on . . . specified anatomical areas or the conduct or simulation of specified sexual activities." The Guild first zeroes in on the word "featuring" and argues that it does not encompass the showing of just one adult film; rather it should be interpreted to mean "regularly featur[ing]" such films. The dissent agrees with the Guild and concludes that characterizing the Guild as an "adult amusement establishment" for its single showing of an adult film defies common understanding. Dissenting Opinion, ¶ 50. We disagree and explain. As we have stated, we look to the plain language of the Ordinance. To include the concept that the showing must be regular, we would have to add a word that is not there and rely on other jurisdictions that interpret differently worded statutes. "Feature," in its verb form, is defined as "to make a feature of; give special prominence to," with the following example given: "the theater was *featuring* a murder-mystery film." *Webster's Third New Int'l Dictionary* 832 (1976). As the district court noted, movie theaters and television stations often advertise the presentation of a feature film. To bolster its argument, the Guild ventures to other jurisdictions for interpretive support. It unconvincingly relies on one case that is based on an ordinance that does not use the word "feature"; one case in which the ordinance explicitly uses the phrase "regularly features"; and two cases, including an unpublished opinion out of Alaska, that deal with live "adult cabaret." *See Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000); *Schmitty's City Nightmare, LLC v. City of Fond Du Lac*, 391 F. Supp. 2d 745 (E.D. Wis. 2005); *Stevens v. Matanuska-Susitna Borough*, Nos. A-9674, A-9683, 2007 WL 2143008 (Alaska Ct. App. July 25, 2007); *People v. Super. Ct. (Lucero)*, 774 P.2d 769 (Cal. 1989). None is persuasive or materially on point with the statutory analysis in this case.

**{8}** Finally, the Guild points out a difference between the Ordinance's reference to live exhibition and its reference to the exhibition of films. The Ordinance uses singular language to refer to any live exhibition and plural language for the exhibition of film. According to the Guild, this language difference suggests that just one live performance could be expected to produce negative secondary effects but that it would take multiple exhibitions of films to create those effects and thus trigger enforcement. We disagree. The Ordinance explicitly provides that any plural language used includes the singular and vice versa, Albuquerque, N.M., Rev. Ordinances § 14-16-1-5(A)(2), and we see no reason to find an exception to that common statutory language. *Cf. State ex rel. Richardson v. 5th Jud. Nominating Comm'n*, 2007-NMSC-023, ¶ 17, 141 N.M. 657, 160 P.3d 566. Nothing in the Ordinance suggests that the City Council made a distinction between live acts and feature films.

**{9}** We are not persuaded by the Guild's arguments that the Ordinance may and should be more narrowly construed to avoid constitutional analysis. We agree with the district

4

court's interpretation. When the Ordinance is read literally, nothing in its plain meaning compels us to transform the word "featuring" into "regularly featuring." Thus, we conclude that any theater which features an adult film—i.e., hosts a screening of a movie that depicts the anatomical areas and sexual acts listed in the Ordinance—is an adult amusement establishment as defined by the Ordinance, even if only one movie is shown, and, as such, it is subject to the terms of the Ordinance.

**B.     The Ordinance Is Not Unconstitutionally Vague**

**{10}**     The Guild next contends that the Ordinance—specifically its definition of an "adult amusement establishment"—fails to give adequate notice that the screening of just one adult film outside a permissible zone transforms a mainstream theater into an adult amusement establishment. Thus, the Guild asks us to declare the Ordinance void for vagueness as applied to the Guild.

**{11}**     "A strong presumption of constitutionality underlies each statute, and the defendant has the burden to prove unconstitutionality beyond all reasonable doubt." *Shawna C.*, 2005-NMCA-066, ¶ 32. The United States Constitution "does not require impossible standards of clarity in statutes, only that the language convey[] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Id.* ¶ 34 (alteration in original) (internal quotation marks and citation omitted). Neither does the Constitution require "mathematical certainty from our language[,]" but rather "flexibility and reasonable breadth[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (internal quotation marks and citation omitted). Our task is not to appraise the wisdom of the City's decision, because a city "'must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" *City of Renton v. Playtime Theatres, Inc.* (*Renton*), 475 U.S. 41, 52 (1986) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976)). Thus, we will "strive to avoid" a remedy that requires us to "tamper with the text" of an ordinance. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995). As the New Mexico Supreme Court has stated,

> In the enactment of statutes[,] reasonable precision is required. Legislative enactments may be declared void for uncertainty if their meaning is so uncertain that the court is unable, by the application of known and accepted rules of construction, to determine what the [L]egislature intended with any reasonable degree of certainty. But absolute or mathematical certainty is not required in the framing of a statute.

*State ex rel. Bliss v. Dority*, 55 N.M. 12, 29, 225 P.2d 1007, 1017 (1950).

**{12}**     A statute or ordinance will be deemed to be unconstitutionally vague if it has one of two fatal characteristics:  it fails to give people of ordinary intelligence a reasonable opportunity to know what activity is prohibited so as to allow them to conform their actions to the law, or it fails to provide explicit standards and thus invites police officers,

5

prosecutors, judges, or juries to engage in arbitrary and discriminatory enforcement. *State v. Laguna*, 1999-NMCA-152, ¶¶ 25-26, 128 N.M. 345, 992 P.2d 896. Finally, we have observed that a defendant "will not succeed if the statute clearly applied to the defendant's conduct." *Shawna C.*, 2005-NMCA-066, ¶ 32. The standard two-step analysis follows.

**1.      Notice to Individuals of Ordinary Intelligence**

**{13}**     The Guild points to a dearth of previous similar convictions by the City and to narrow interpretations of such laws in other jurisdictions in an effort to argue that a proprietor in its position would logically conclude that the Ordinance does not apply to an independent cinema showing only one adult film. As we discussed above, the decisions of other jurisdictions are not on point or persuasive. We instead focus on how the Ordinance applies to the facts before us, based on an interpretation by a reasonable person. *See Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) ("The standard is an objective one. Courts ask whether the law presents an ordinary person with sufficient notice of . . . what conduct is prohibited or proscribed[.]" (internal quotation marks and citations omitted)).

**{14}**     Two recent federal cases offer guidance in judging whether a statute or ordinance gives adequate notice to people that their behavior is subject to a legislation's proscriptions. In *Holder v. Humanitarian Law Project*, __ U.S. __, __, 130 S. Ct. 2705, 2712-14 (2010), United States citizens and groups sought an injunction to prohibit enforcement of a criminal ban on providing "material support" or "expert advice or assistance" to designated foreign terrorist organizations, alleging unconstitutional vagueness of the language of the statute. *Id.* (internal quotation marks and citation omitted). Noting that "perfect clarity and precise guidance have never been required" in the drafting of a statute—even one limiting expressive activity—the United States Supreme Court concluded: "[The p]laintiffs' activities . . . fall comfortably within the scope of 'expert advice or assistance': A reasonable person would recognize that teaching [an organization] how to petition for humanitarian relief before the United Nations involves advice derived from, as the statute puts it, 'specialized knowledge.'" *Id.* at 2719-20 (internal quotation marks and citations omitted). The Court focused on the meaning as applied to the parties before it: "Of course, the scope of the material-support statute may not be clear in every application. But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail." *Id.* at 2720.

**{15}**     Similarly, in *Dickerson*, a New York statute prohibited people from entering federal buildings while carrying unauthorized police shields or other insignia "in any way resembling" that worn by police officers. *See* 604 F.3d at 736-37 (emphasis and citation omitted). The plaintiffs, carrying authentic-looking but unauthorized police badges into a federal building, sued over unconstitutional enforcement of the statute and appealed when the case was dismissed. *See id.* The court stated that a literal reading of the statute could lead to such absurd results as criminalizing a children's game of cops and robbers, and might be susceptible to a facial challenge; however, the court held that an analysis of the statute,

*as applied* to the plaintiffs, gave them notice that their actions would violate the law. *See id.* at 746. The court, conceding the statute suffered from "ambiguity as to the margins," concluded: "[N]either the widespread availability of hats and T-shirts bearing the NYPD logo, nor the prevalence of toy badges, would be likely to confuse a reasonable person as to the illegality of an adult carrying a facsimile of a police shield in his belongings while entering a government building." *Id.* at 747.

**{16}** Like the parties in *Holder* and *Dickerson*, the Guild challenges an ordinance that might be hampered by ambiguity in some settings. But when the Guild exhibited what both parties agree was an adult film, a reasonable theater owner would have been on notice that the Ordinance governing adult amusement establishments would come into play. The Guild, seeking to exploit any weakness it might find in the Ordinance, offers a hypothetical: If the theater had exhibited a five-minute movie featuring topless women discussing Descartes, would it be fairly punished under the Ordinance? That is a provocative question but a red herring; such a hypothetical might help sustain a facial challenge, but here, with an as-applied challenge, we deal with the concrete facts at hand. And the Guild does not dispute that it showed an adult film outside of a circumscribed zone as defined in the Ordinance. Had it merely shown an art film featuring some nudity—as many mainstream and independent cinemas do on a regular basis—and been cited for violating the Ordinance, then the Guild could make that argument. In this case, such a hypothetical has no bearing on our analysis. Relying on our statutory interpretation above, we determine that the Guild knew it was showing a film as defined by the Ordinance and, like the parties in *Holder* and *Dickerson*, had adequate notice that its conduct was prohibited by the Ordinance as applied in this situation.

## 2.    Standards or Guidelines for Enforcement

**{17}** Alternatively, the Guild argues that the Ordinance invites arbitrary and discriminatory enforcement. A legislative body may not "impermissibly delegat[e] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application[.]" *State v. Myers*, 2011-NMSC-028, ¶ 39, 150 N.M. 1, 256 P.3d 13 (emphasis, internal quotation marks, and citation omitted). We have acknowledged, though, that the duties of law enforcement will always require the exercise of a certain degree of police judgment. *Shawna C.*, 2005-NMCA-066, ¶ 39.

**{18}** In the case before us, we are provided with no evidence that the City selectively enforced the Ordinance or singled out the Guild. We also find no evidence that the City improperly trained its officers in identifying adult films and citing violators of the Ordinance. In its argument, the Guild deals mainly in conjecture and speculation, and it relies on the suggestion that because the Guild knows of no other mainstream theater that has been prosecuted for the single showing of an adult film that the City has arbitrarily enforced the Ordinance. It cites a federal case from Colorado—featuring a bakery owner selling a number of adult-oriented cakes—to support its argument. *See Pensack v. City &*

7

*Cnty. of Denver*, 630 F. Supp. 177 (D. Colo. 1986). But in *Pensack*, where the court found inadequate notice to the bakery and insufficient standards for law enforcement, the ordinance at issue defined adult establishments as those having "substantial" or "significant" portions of its stock emphasizing sexual activities. *Id.* at 178. Here, the Ordinance has no threshold standard for movie theaters exhibiting adult fare. *Pensack*'s reasoning does not apply here. In the absence of any other evidence, we cannot conclude that the Ordinance is susceptible to arbitrary or discriminatory enforcement, particularly when applied to the Guild's screening of what it admits to be an adult film. Because the Guild fails both prongs of the analysis, we conclude that the Ordinance is not unconstitutionally vague as applied in this instance.

## C. The Ordinance Is a Proper Time-Place-Manner Restriction and Does Not Abridge Freedom of Speech As Applied to the Guild

### 1. N.M. Constitution Article II, Section 17 vs. First Amendment

**{19}** The parties begin with a debate over whether Article II, Section 17 of the New Mexico Constitution affords free-speech rights that are greater than those declared in the First Amendment of the United States Constitution. The Guild asks that we "bear this heightened protection in mind" when conducting our analysis and to err on the side of favoring free-speech rights when faced with a split in the law of other jurisdictions. For that argument, the Guild relies on *City of Farmington v. Fawcett*, 114 N.M. 537, 843 P.2d 839 (Ct. App. 1992), an obscenity case that has no bearing on the facts of the case before us. Although the Guild pushes for an analysis under the New Mexico Constitution, it offers the alternative argument that the Ordinance also fails under the United States Constitution.

**{20}** New Mexico has adopted the interstitial approach to interpreting our state constitution. *See State v. Perry*, 2009-NMCA-052, ¶ 24, 146 N.M. 208, 207 P.3d 1185. "A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. "[S]tate courts should be sensitive to developments in federal law. Federal precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive." *Id.* ¶ 21 (internal quotation marks and citation omitted). We find none of those three situations to apply in the case before us. Further, we have previously held that "the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions." *State v. Ongley*, 118 N.M. 431, 432, 882 P.2d 22, 23 (Ct. App. 1994), *modified on other grounds by Gomez*, 1997-NMSC-006; *see State v. Rendleman*, 2003-NMCA-150, ¶ 58, 134 N.M. 744, 82 P.3d 554, *overruled on other grounds by State v. Myers*, 2009-NMSC-016, 146 N.M. 128, 207 P.3d 1105. Thus, we see no reason to depart from traditional federal jurisprudence in this area, and we proceed with a standard First Amendment analysis.

### 2. Facial vs. As-Applied Challenges

**{21}**     As a threshold matter, we note that the parties spar over the distinction between facial and as-applied challenges and its application to the case before us.  While we disagree with the Guild's assertion that the district court refused to conduct an as-applied analysis, we do note that the district court at times may have overemphasized the significance of the Guild's choice to not press a facial challenge in this case when analyzing the distinction between facial and as-applied challenges.  The Guild has stipulated that it did not bring a facial challenge; it did not stipulate to the facial validity of the Ordinance in all its applications.

**{22}**     While the Guild's choice to forgo a facial challenge to the Ordinance weakens the Guild's arguments overall, that choice does not render its action null and void, nor does it obviate the need for a full analysis of the time-place-manner zoning, which we flesh out in the section that follows.  The United States Supreme Court has stated that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."  *Citizens United v. Fed. Election Comm'n*, __ U.S. __, __, 130 S. Ct. 876, 893 (2010).

**{23}**     Finally, we resist any temptation to take it upon ourselves to expand the scope of our review to analyze the constitutionality of the Ordinance in its entirety under the theory of overbreadth.  The overbreadth doctrine is "strong medicine" to be applied "sparingly and only as a last resort."  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), *superseded by statute on other grounds as stated in Bauers v. Cornett*, 865 F.2d 1517 (8th Cir. 1989).  The United States Supreme Court has further reasoned:  "It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied."  *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989).  "Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws."  *Id.* at 485.  We thus proceed to conduct a time-place-manner analysis of the constitutionality of the Ordinance as applied to the Guild.

### 3.     Time-Place-Manner Zoning

**{24}**     Our First Amendment analysis recognizes the bedrock principle of the right to free speech articulated by the framers of both the state and federal constitutions.  "'At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.'"  *United States v. Strandlof*, 667 F.3d 1146, 1156-57 (10th Cir. 2012) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573 (2002) (alteration, internal quotation marks, and citation omitted).  "However, this principle, like other First Amendment principles, is not absolute."  *Ashcroft*, 535 U.S. at 573.  We have long held that First Amendment rights "are not immune from governmental regulation" and a city "may impose reasonable restrictions

on the time, place, and manner in which such rights are exercised." *City of Las Cruces v. Huerta*, 102 N.M. 182, 186, 692 P.2d 1331, 1335 (Ct. App. 1984) (internal quotation marks and citation omitted). The zoning power of local governments, which allows limited restrictions on First Amendment freedoms, "is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981). The United States Supreme Court, however, has cautioned, such zoning power "is not infinite and unchallengeable[.]" *Id.*

{25}     The rationale for allowing zoning regulations in this context is that a "city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Young*, 427 U.S. at 71. In *Young*, the Supreme Court upheld a Detroit zoning ordinance that prohibited adult amusement establishments, including movie theaters, from locating within 1,000 feet of one another. *See id.* at 52, 72-73. The plurality opinion and concurrence agreed that such a regulation of adult theaters was not an impermissible restriction of First Amendment rights, because it was targeted not at the content of the speech involved but at the negative secondary effects caused by adult entertainment. *See id.* at 71 n.34, 78-79 (Powell, J., concurring). The Court found no restriction on the amount of speech allowed; merely that the speech was limited to certain areas. *See id.* at 51. Ten years later, the Court upheld an ordinance prohibiting adult amusement establishments from locating within 1,000 feet of residential areas, churches, parks, and schools. *See Renton*, 475 U.S. at 43, 52. The Court found that the ordinance left five percent of the city's land available for use by adult establishments, an amount deemed adequate to show that the city was not targeting the content of the speech. *See id.* at 53-54.

{26}     *Young* and *Renton* thus permit municipalities to use zoning powers to reduce or eliminate the negative secondary effects of adult entertainment by either scattering such establishments or concentrating them in circumscribed zones with similar activities. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002); *Renton*, 475 U.S. at 52; *Young*, 427 U.S. at 72-73. Such zoning ordinances are subject to intermediate scrutiny. *See Alameda Books, Inc.*, 535 U.S. at 434.

{27}     While the Supreme Court has never veered from that line of case law, it has struggled with the "fiction" of using the term "content neutral" to cover zoning laws that clearly apply only to adult material. *Alameda Books, Inc.*, 535 U.S. at 448 (Kennedy, J., concurring). However, the Court has endorsed the zoning power over adult amusement establishments under the idea that cities are not regulating the content of the entertainment provided by these businesses but rather the negative secondary effects that such adult material produces in the surrounding community, such as crime and sex offenses. *See id.* at 434; *Renton*, 475 U.S. at 48; *Young*, 427 U.S. at 54-55. Such regulations are contrasted with those that impermissibly target the direct effects of the speech on the listener or viewer. "Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." *Boos v. Barry*, 485 U.S. 312, 321 (1988). For instance, if the City had enacted the

10

Ordinance based on fears of the psychological impact that adult films have on viewers, then the regulation would not be content-neutral, and thus would be subject to the highest level of scrutiny under First Amendment analysis. *See Boos*, 485 U.S. at 321. We must be careful to focus our "principal inquiry" on determining "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "Thus, the Court has recognized that this kind of regulation, though called content neutral, occupies a kind of limbo between full-blown, content-based restrictions and regulations that apply without any reference to the substance of what is said." *Alameda Books, Inc.*, 535 U.S. at 457 (Souter, J., dissenting).

### a.      Strict Scrutiny vs. Intermediate Scrutiny

**{28}**    As a preliminary matter, the Guild seeks to exploit that subtle fissure between content-based and content-neutral regulations in the realm of adult entertainment. It argues that the City must be targeting the content of the film, because the City could not possibly find it necessary to police the negligible or nonexistent secondary effects from the showing of only one film. The Guild spends a good part of its brief in chief urging application of the highest standard of review in this case: strict scrutiny. We reject that argument.

**{29}**    "Strict scrutiny applies when the violated interest is a fundamental personal right or civil liberty guaranteed by the constitution." *ACLU of N.M. v. City of Albuquerque*, 2006-NMCA-078, ¶ 19, 139 N.M. 761, 137 P.3d 1215 (internal quotation marks and citation omitted). Under that heightened review of a legislative action, the burden of proof is on the government to show that it has a compelling interest in the challenged scheme and that it has accomplished its goals by employing the least restrictive means. *See id.* If the City were targeting content of adult films with the Ordinance, strict scrutiny would apply; if it were merely seeking to combat negative secondary effects of such films, then we would apply a more relaxed level of scrutiny (discussed in the next section below). *See Alameda Books, Inc.*, 535 U.S. at 448 (Kennedy, J., concurring). The Guild argues that the City improperly targeted the content of its expression rather than the negative secondary effects, but the Guild misapplies case law in order to make its point. The Guild claims that the task of this Court is to examine whether either negative secondary effects or the content of the movie were the predominant concern behind *application* of the Ordinance. On the contrary, the cases cited by the Guild state that a court must examine whether secondary effects or content were the predominant concern behind the *enactment* of an ordinance—not its subsequent application. *See R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 409 (7th Cir. 2004) (stating that "we must examine whether the [o]rdinance was *designed* to suppress the content of erotic expression or to address the negative secondary effects caused by such expression" (emphasis added)); *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 623 (7th Cir. 2004) ("The 'content-neutrality' inquiry is therefore subsumed by the inquiry into a municipality's purpose in enacting the regulation."). The rest of the Guild's strict-scrutiny argument proceeds from that faulty premise.

**{30}**    Here, without a full trial below on the issues, there is no evidence that the City was

11

targeting the content of adult films in enacting the Ordinance; in fact, the City asserts that its predominant concern in enacting the Ordinance was combating the secondary effects of such films. The Guild does not rebut that contention. Absent evidence that the City was going after content when enacting the Ordinance, we refrain from analyzing its actions under the strict scrutiny that would favor the Guild. *See BBI Enters., Inc. v. City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995) ("There is no need to elaborate further on the deficiencies in either party's proof, for where as here neither side has supplied entirely reliable information, the party having the burden of persuasion . . . must suffer the consequences of such uncertainty."). We thus proceed with the intermediate level of time-place-manner scrutiny.

### b. Time-Place-Manner Analysis

**{31}** The United States Supreme Court starts the analysis of time-place-manner regulations by asking two threshold questions: (1) Does the ordinance ban adult establishments altogether, and (2) does the regulation target the content of the expression? *See Alameda Books, Inc.*, 535 U.S. at 434. If the answer to each question is "no," then the ordinance can be analyzed under time-place-manner regulation. *See id.* The New Mexico Supreme Court has outlined three requirements for valid time-place-manner zoning: (1) the restriction on speech must be content neutral, that is, "justified without reference to the content of the regulated speech"; (2) the restriction must serve a "significant governmental interest"; and (3) the restriction must "leave open ample alternative channels for communication of the information." *Stuckey's Stores, Inc. v. O'Cheskey*, 93 N.M. 312, 319, 600 P.2d 258, 265 (1979) (internal quotation marks and citation omitted). The United States Supreme Court expands on the second prong by requiring that the ordinance in question be "narrowly tailored" to serve that significant governmental interest. *Renton*, 475 U.S. at 52, 63 (citation omitted).

**{32}** The appropriate standard for "reviewing challenges to content-neutral zoning ordinances targeting the secondary effects of adult establishments" applies "regardless of whether that challenge is styled as facial or as-applied." *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 n.3 (4th Cir. 2009). Lower courts have faithfully applied the analysis during the past quarter century: "*Renton*'s constitutional framework grants the city broad discretion to choose the means and scope of its regulation of sexually oriented businesses." *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683, 689 (10th Cir. 1998).

### I. Content Neutral

**{33}** We first dispose of the two threshold questions. First, the City has not entirely banned adult amusement establishments from operating in the City, either directly or indirectly. *Cf. Schad*, 452 U.S. at 76 ("As we have observed, *Young* . . . did not purport to approve the total exclusion from the city of theaters showing adult . . . materials."). The City, in an unrebutted assertion, states that about five percent of the municipality's acreage is zoned to allow the exhibition of adult films. That level of set-aside comports with the

amount of land mass deemed reasonable by the Court in *Renton*. *See* 475 U.S. at 53. Second, the Guild does not challenge the City's assertion that, in *enacting* the Ordinance, the City was not regulating content but rather the secondary effects that flow from the showing of adult films. The Guild also concedes that the City has that zoning authority under its powers to regulate the time, place, and manner of the entertainment offered by adult amusement establishments.

**{34}**   It is when we get to the time-place-manner analysis that the Guild challenges the City's actions. The Guild contends that, as applied in this case, the City fails the two prongs of the *Renton* test:   that the Ordinance is not narrowly tailored to serve a significant governmental interest and that it does not leave the Guild with adequate alternative channels of communication.

### ii.        Narrowly Tailored to Serve a Significant Governmental Interest

**{35}**   An ordinance qualifies as narrowly tailored "so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest. If these standards are met, courts should defer to the government's reasonable determination." *Ward*, 491 U.S. at 782-83. "The government's purpose is the controlling consideration." *Id.* at 791. While the regulation must be narrowly tailored, "it need not be the least restrictive or least intrusive means of doing so." *Id.* at 798; *see Fox*, 492 U.S. at 477 ("We have refrained from imposing a least-restrictive-means requirement—even where core political speech is at issue—in assessing the validity of so-called time, place, and manner restrictions.").

**{36}**   The City asserted that its goal in enacting the Ordinance was to combat the negative secondary effects produced by adult theaters in general, and the Guild offers no rebuttal. The stated purpose of the City's zoning regulations is "to create orderly, harmonious, and economically sound development in order to promote the health, safety, convenience, and general welfare of the citizens of the city." Albuquerque, N.M., Rev. Ordinances § 14-16-1-3(A). The City asserts, without challenge by the Guild, that the drafters of the Ordinance relied on "numerous studies and other evidence" concerning the adverse secondary effects emanating from adult amusement establishments. Because the Guild does not rebut that assertion, we defer to the City's presumptively reasonable determination in the name of public health, safety and welfare.

> The municipality's evidence must fairly support the municipality's rationale for its [adult amusement] ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets its burden.

6A Eugene McQuillin, *The Law of Municipal Corporations* § 24:128, at 472 (3d ed. 2007)

13

(footnote omitted).

**{37}** It is well-established New Mexico law that "[t]o be within the authorized purposes the zoning ordinance must bear some reasonable relationship to the general welfare." *City of Santa Fe v. Gamble-Skogmo, Inc.*, 73 N.M. 410, 413, 389 P.2d 13, 15 (1964). In the case before us, no evidentiary hearing was conducted to flesh out the details of the City's reasons for legislating against the negative secondary effects of adult entertainment. Specifically, we have no way of divining whether the "numerous studies and other evidence" relied on by the City in any way address the negative secondary effects of the screening of adult films on a rare or occasional basis.

**{38}** When similar regulations fail, a municipality tramples on protected speech and ignores ample alternative means of combating secondary effects. In a recent case, *Ascherl v. City of Issaquah*, No. C11-1298MJP, 2011 WL 4404145, at *2-3 (W.D. Wash. 2011), a municipality sought to limit the distribution of leaflets to a "free[-]speech zone" in order to "serve public safety concerns, minimize congestion, and facilitate the orderly flow of pedestrian traffic" during an annual festival. The court found the ordinance inadequately tailored and ruled in favor of a pamphleteer who ventured outside the zone, because the court found "no evidence that leafleting by itself causes congestion or prohibits the orderly flow of pedestrian traffic, let alone creates a public safety concern." *Id.* at *3. In contrast, the respondent was found to have properly tailored its adult entertainment ordinance by showing its "great interest in protecting and preserving the quality of its neighborhoods through effective land-use planning" and its "sincere and sustained effort to enhance and improve the quality of life in Seattle." *Northend Cinema, Inc. v. City of Seattle*, 585 P.2d 1153, 1158-59 (Wash. 1978) (en banc). The Washington Supreme Court said of the ordinance that is similar to the one before us and the Court in *Young*: "It demonstrates a reasonable decision that the public welfare is best served by having this particular type of speech take place only in certain areas of the community. The ordinance thus remains neutral regarding the content of the films[.]" *Northend Cinema, Inc.*, 585 P.2d at 1158. The court concluded that the ordinance was not "a disguised form of censorship." *Id.* at 1159.

**{39}** Absent evidence to the contrary, we take the City at its word that the Ordinance was designed to promote its significant interest of combating the negative secondary effects of adult entertainment. And we believe that the City, like Seattle in *Northend Cinema, Inc.* and like numerous other towns in the wake of *Young*, took a reasonable route in accomplishing its goal. To that end, we refuse to place ourselves in the position of legislators acting on behalf of the health, safety, and welfare of the public. *See Ward*, 491 U.S. at 800 (stating that the validity of time-place-manner regulations "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted" (internal quotation marks and citation omitted)).

**{40}** As noted above, the Guild directs our attention from the enactment of the Ordinance and focuses on its application. It attacks the City on the grounds that, in this instance, the

14

showing of one adult film produced no negative secondary effects. Although the Guild does not rebut the City's assertion that the Ordinance was *enacted* to combat the negative secondary effects associated with the exhibition of adult films, it asserts that the City failed to produce evidence of negative secondary effects resulting from the Guild's single showing of the adult film *in this instance*. The Guild's argument fails, because it is well-established that cities, in enforcing a time-place-manner restriction, need not prove the existence of negative secondary effects in each instance: "[T]hat fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Id.* at 801; *see Independence News, Inc.*, 568 F.3d at 156 (stating that a city "does not have to show that a particular adult establishment generates adverse secondary effects each time it seeks to enforce" such a zoning ordinance); *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 607 (8th Cir. 2001) ("[A] city would have the burden of showing precisely how many adult performances were capable of producing an unacceptable level of antisocial activity before the city could regulate those performances. We are satisfied that neither the [F]irst [A]mendment nor Supreme Court precedent requires a city to do the impossible."); *City of Columbia v. Pic-A-Flick Video, Inc.*, 531 S.E.2d 518, 521 (S.C. 2000) ("Municipalities do not have to show negative secondary effects in order to enforce adult zoning provisions."); *BBI Enters., Inc.*, 874 F. Supp. at 891 n.4 (stating that "once an ordinance is rendered facially valid by legitimate legislative findings as to the general problem to be dealt with, a specific operation does not necessarily escape the [o]rdinance's provisions by showing that those generically[]validating characteristics do not in fact apply to that operation").

**{41}** We conclude that the Ordinance serves a significant governmental interest and is narrowly tailored to achieve that interest.

### iii. Leaves Open Alternative Channels for Communication

**{42}** The Guild makes a brief argument and cites to only one out-of-state federal district court case that is not on point for the proposition that the Ordinance does not provide it with "practical alternative avenues for showing an occasional adult film." It may be true that the Guild's regular customers prefer not to frequent an adult cinema, and it may be inconvenient for the Guild to rent out such a cinema in another part of town properly zoned for such an exhibition. But just recognizing such an option acknowledges that at least one alternative exists for the Guild to present adult films in Albuquerque, and it is not an entirely unreasonable one. Zoning laws inevitably create hurdles for various behavior and forms of expression in certain parts of town; there is no evidence to suggest that this one rises to the level of an unconstitutional burden on the Guild's free-speech rights. As the Washington Supreme Court stated: "[A]lthough potential viewers would be able to see the films only in those downtown areas, there is no evidence that this places any burden on the adult movie market." *Northend Cinema, Inc.*, 585 P.2d at 1158. In the case before us, the Guild has produced no evidence that it was left with no reasonable alternative channels of communication. We thus conclude that the Ordinance is a constitutionally valid regulation of the time, place, and manner of the exhibition of adult films as applied to the facts of this

15

case.

## III.    CONCLUSION

**{43}**    We are aware of the problems of line-drawing that this case represents.   The Ordinance does not provide a threshold level of adult film screenings that would be tolerated outside the permissible zones.   The City voices a concern about the potential cumulative effect of allowing even occasional showings of adult films in areas not zoned for such behavior.  *Cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) (supporting a federal agency's enforcement action against isolated uses of profanity on television and stating that "[t]o predict that complete immunity for fleeting expletives . . . will lead to a substantial increase in fleeting expletives seems to us an exercise in logic").  We recognize that the Ordinance affects First Amendment rights.   We also recognize that the Guild's position is that the Ordinance regulating adult amusement establishments is overbroad and reaches some speech that does not create the type of secondary effects it seeks to protect against.  This case, however, does not present us with that question, and the record before us does not provide the proper basis on which to declare that the City may not prosecute mainstream movie theaters that occasionally exhibit pornographic films.

**{44}**    As discussed above, we generally defer to the zoning power of municipalities, even though it is inevitable that the lines drawn pursuant to that power will result in winners and losers.  "[E]very line drawn by a legislature leaves some out that might well have been included.  That exercise of discretion, however, is a legislative, not a judicial, function." *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974) (footnote omitted).  We applaud the wisdom of Justice Oliver Wendell Holmes:

> When a legal distinction is determined . . . a point has to be fixed or a line has to be drawn . . . to mark where the change takes place.  Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. . . .  But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the [l]egislature must be accepted unless we can say that it is very wide of any reasonable mark.

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting).

**{45}**    Based on the record before us, we cannot say here that the Ordinance missed the mark in confining the exhibition of adult films to specified zones within the City limits. The enforcement of the Ordinance—even against a mainstream theater screening one adult film—was not unconstitutionally applied in this case.  For the foregoing reasons, we affirm the decision of the district court.

**{46}    IT IS SO ORDERED.**

16

_____

**CELIA FOY CASTILLO, Chief Judge**

**I CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

**JONATHAN B. SUTIN, Judge, dissenting**

**SUTIN, Judge (dissenting).**

**{47}**     I respectfully dissent.

**{48}**     This case appears to be one constructed by both parties as a single-film-test case of first impression—but ill-fitting in the universe of cases and myriad of constitutional analyses relating to the validity of ordinances that regulate adult amusement establishments. Here is how the district court insightfully and colorfully described the fretful fate it faced.

> On the surface, the scenario presented by the parties is starkly clear as are the parties' opposition positions. The law applicable is, however, anything but clear. Indeed, the [c]ourt can analogize itself to a small fish navigating through a largely unfathomable murky bayou at night during a storm fully aware of the likelihood of hungry alligators (appellate courts, critical attorneys and legal commentators) lurking nearby. . . .
>
> Viewed against the backdrop of the veritable flood of published adult use litigation cases, this appears to be a relatively carefully crafted "test" case on both sides. It is a pity that the law in this area is not as clear as the crafting of the case by the parties. As the City observes: "This case presents the [c]ourt with some novel legal issues under New Mexico law in a larger context wherein even the federal courts have been far from uniform."

**{49}**     This case was factually unsatisfactorily developed. It comes to us with no metropolitan court record and no factual record in the district court save a sparse and inadequate stipulation by the parties to the facts. Nevertheless, I address the critical points instead of simply calling for remand for further factual development. In my view, the City's outlier zoning ordinance (the Ordinance) cannot be enforced against the Guild for two distinct reasons. First, the Guild cannot be considered an "adult amusement establishment" and, second, the Ordinance as applied to the Guild cannot withstand constitutional scrutiny.

**The Guild Cannot Be Considered an Adult Amusement Establishment**

**{50}**     The principal question here is whether the Guild should even be considered an adult

17

amusement establishment. The answer is that it should not; and the Ordinance should be construed to exclude the Guild's single showing. The Guild is an established, mainstream, independent, single-screen, neighborhood, art theater. Year-round, with a single weekend exception, the Guild does not daily or weekly feature or concentrate on sexually oriented conduct in the films it shows. It in no way regularly and substantially shows adult films. Adult amusement establishments, on the other hand, concentrate daily or weekly on sexually oriented adult material. These establishments are theaters that show adult films regularly as a substantial part of their regular business. This description is one from common understanding. As articulated by the court in *Schmitty's City Nightmare, LLC*, "[i]t would do violence to the meaning of both 'oriented' and 'establishment' to conclude that a venue offering only occasional adult entertainment could constitute an establishment 'oriented' to adult entertainment. . . . One would not call a bar a 'martini bar' if it served martinis only once a year, just as one would not call a club a 'jazz club' if 99% of its music was rock and roll." 391 F. Supp. 2d at 756-57. To characterize the Guild as an "adult amusement establishment" for its single showing of an adult film defies a common understanding of that phrase.

{51}    In addition, characterization of the Guild as an adult amusement establishment is not supported by case law. It is the adult amusement establishment that gave rise to the use of the negative secondary effects rationale to hold restrictions content-neutral. Two United States Supreme Court film-based cases set the First Amendment precedent on the issue and for this case. The first case is *Young*, 427 U.S. 50. *Young* gave origin to First Amendment analyses in regard to zoning of adult theaters. *See id.* at 56 n.12, 70-71 (stating that "[e]ven though the First Amendment protects communication in [the area of adult films] from total suppression, . . . the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures" and explaining that the question then remains whether the at-issue ordinances may be justified by the city's stated "compelling" interest). In *Young*, the two theaters involved "propose[d] to offer adult fare on a regular basis." *Id.* at 59. The Court determined that municipalities may control the location of such theaters "either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city." *Id.* at 62. The Court stated that "apart from the fact that the . . . classification is predicated on the content of material shown in the respective theaters, the regulation of the place where such films may be exhibited does not offend the First Amendment." *Id.* at 63. The Court held that what was "ultimately at stake [was] nothing more than a limitation on the place where adult films may be exhibited, even though the determination of whether a particular film fits that characterization turns on the nature of its content, . . . the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures." *Id.* at 71-72 (footnote omitted).

{52}    In the second case, *Renton*, 475 U.S. 41, two theater owners intended to "exhibit feature-length adult films" and therefore challenged an ordinance prohibiting "any 'adult motion picture theater'" from certain locations. *Id.* at 44-45. Construing *Young*, the *Renton* Court noted that because the ordinance did not ban adult theaters altogether, the ordinance

was "therefore properly analyzed as a form of time, place, and manner regulation." *Id.* at 46. The Court noted, too, that "so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.* at 47. The Court recognized that the ordinance treated theaters that "specialize[d] in adult films differently from other kinds of theaters" and that the city's "'*predominate* concerns' were with the secondary effects of adult theaters" on the surrounding community. *Id.* The Court concluded, therefore, that the ordinance was "aimed not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community" and that this was "completely consistent" with its definition of content-neutral regulations. *Id.* at 47-48. The Court also determined that the ordinance was "*narrowly tailored to affect only that category of theaters shown to produce the unwanted secondary effects*[.]" *Id.* at 52 (emphasis added) (internal quotation marks and citation omitted).

**{53}** The City enacted the Ordinance under the umbrella of the *Young* and *Renton* rulings. This is indicated both by the City's contention that its goal in enacting the Ordinance was to combat the negative secondary effects produced by adult theaters and that it relied on "numerous studies and other evidence" concerning the adverse secondary effects emanating from adult amusement establishments. Yet, by including the Guild in its definition of "adult amusement establishments," the City sweeps into its zoning regulation a business that falls outside of the content-neutral scope and rationale of *Young* and *Renton*. As delineated in *Young* and *Renton*, adult establishments (1) regularly show or "specialize" in the showing of adult films, and (2) they are associated with pernicious or negative secondary effects on the surrounding community or neighborhood. *Young*, 427 U.S. at 55, 59, 72; *Renton*, 475 U.S. at 47.

**{54}** Here, the parties stipulated that "[n]either 'Pornotopia' generally nor the specific showing of 'Couch Surfers, Trans Men in Action' caused any negative secondary effects to businesses on the same street as the Guild or to the neighborhood[.]" Moreover, in its oral argument to this Court, the City conceded that there were no negative secondary effects anticipated from the single showing of an adult film. And, further, the parties stipulated that "[o]ther than one weekend a year when the erotic film festival takes place at the Guild, the Guild shows movies of the art-house variety, *i.e*, a variety of both independent fictional and documentary films that do not contain an emphasis on specified anatomical areas or specified sexual activities."

**{55}** Because the Guild operates year-round as an "art-house" theater, and because there were no actual or anticipated secondary effects from its single showing of an adult film, the Guild is not properly characterized as an adult amusement establishment as contemplated by the Court in *Young* and in *Renton*. In *Young* and *Renton*, the ordinances could escape strict scrutiny as content-based precisely and solely because the restrictions were narrowly tailored to cover only the type of establishment shown by studies to cause or likely to cause negative secondary effects. It was that type of establishment that was characterized as an

19

"adult establishment" subject to zoning restriction.

**{56}** Under these circumstances, the reasoning in *Tollis, Inc. v. San Bernardino County*, 827 F.2d 1329 (9th Cir. 1987), and that in *Lucero*, 774 P.2d 769, is applicable and persuasive. In *Tollis*, the court stated:

> the [c]ounty has presented no evidence that a single showing of an adult movie would have any harmful secondary effects on the community. The [c]ounty has thus failed to show that the ordinance, as interpreted by the [c]ounty to include any theater that shows an adult movie a single time, is sufficiently narrowly tailored to affect only that category of [theaters] shown to produce the unwanted secondary effects. Nor do we see how the [c]ounty could make such a showing, since it is difficult to imagine that only a single showing ever, or only one in a year, would have any meaningful secondary effects.

*Tollis, Inc.*, 827 F.2d at 1333 (internal quotation marks and citation omitted); *see also BZAPS, Inc.*, 268 F.3d at 609 (Bye, J., concurring in part and dissenting in part) ("An ordinance that allows the city to regulate the content of a single performance, without presenting evidence that a single performance causes adverse secondary effects, is not narrowly tailored.").

**{57}** Likewise, when presented with the question of "the appropriate constitutional standard by which to define the 'use' necessary to make a movie theater an 'adult motion picture theater[,]'" the California Supreme Court determined that "a 'single use' standard [was] insufficiently tailored to serve [the city's] stated purpose of preventing the clustering or concentration of adult motion picture theaters in any one area." *Lucero*, 774 P.2d at 770, 775. The court explained that "[n]othing in the [city] ordinance's statement of purpose disclose[d] the presence of significant deleterious effects on the community arising out of a single showing of an adult film." *Id.* at 775. And, further, relying on *Tollis, Inc.*, the court stated that "a single showing of an adult movie does not necessarily create the logical relationship between the evil feared and the method selected to combat it." *Lucero*, 774 P.2d at 775-76 (internal quotation marks and citation omitted). The *Lucero* court chose to interpret the ordinance as applying only to those adult entertainment theaters "offering adult fare as a substantial part of their regular business, but . . . not [to] apply to theaters showing only occasional or incidental adult movies." *Id.* at 777.[1]

---

[1] I note Justice Mosk's separate opinion in which he agrees with the constitutional impropriety of the standard employed by the city but points to the danger of the majority setting the standard instead of "allowing cities to experiment with various solutions to the serious problems created by urban blight[,]" citing *Renton* and *Young*, when "[t]o do so the majority must reach out to decide this issue without the benefit of a developed record" among other considerations. *Lucero*, 774 P.2d at 779 (Mosk, J., concurring and dissenting).

**{58}** Here, as in *Tollis* and *Lucero*, there exists no persuasive support for the application of the Ordinance to the Guild for its "single showing" of an adult film. There were no secondary effects, nor is there any evidence of a likelihood of negative secondary effects if the Guild is permitted to show an adult film during its one-weekend-a-year festival.[2]

**{59}** The rationales of *Tollis* and *Lucero* bring reason to bear on the application of the Ordinance. The Ordinance should be narrowly construed so as to exclude the Guild, based on a single showing of an objectionable film, from the definition of an "adult amusement establishment." To narrowly construe the Ordinance in that manner, as applied to the Guild, would be to give the Ordinance constitutionally sound construction. *Cf. Northend Cinema, Inc.*, 585 P.2d at 1157-58 (rejecting a vagueness challenge that was in part based on an ordinance's failure to clarify "how frequently [adult] films must be shown before a building is 'used' for the purpose" of showing adult films, because "any language in the ordinance which is uncertain is readily subject to a narrowing and constitutionally sound construction"); *Entm't Prods. Inc. v. Shelby Cnty., Tenn.*, 588 F.3d 372, 386, 388 n.14 (6th Cir. 2009) (presuming that state courts would refrain from "expansive construction" of adult entertainment if such construction would affect "mainstream artistic performances" or mainstream establishments for the "presentation of a single performance" and noting that "[c]ases of overzealous enforcement against mainstream artistic venues . . . would and should invite litigation by the affected parties on an as-applied basis"). Moreover, by narrowly construing the Ordinance so as to exclude the Guild "from occasionally exhibiting an 'adult' film, we . . . [are able to] constru[e] the [O]rdinance in a constitutional manner while allowing a reasonable and practical construction in conformity with the purpose of the enactment." *Lucero*, 774 P.2d at 776-77; *see also Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 455 (1989) (stating that the Supreme Court consistently interprets statutes "to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction"); *Lovelace Med. Ctr. v. Mendez*, 111 N.M. 336, 340, 805 P.2d 603, 607 (1991) ("It is . . . a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions.").

**Were It Necessary to Reach the Constitutional Question, As Applied to the Guild, the Ordinance Cannot Withstand Constitutional Scrutiny**

**{60}** But for *Young* and *Renton* having created the legal fiction that zoning ordinances of the sort at issue here are content-neutral in their regulation of adult establishments, such ordinances would be presumptively unconstitutional and subject to strict scrutiny because they are, in essence, content-based. *See Renton*, 475 U.S. at 62 (Brennan, J., dissenting)

---

[2] I understand that the weekend festival may show more than one film that the City might see as objectionable. But that is not the circumstance the parties brought to this Court. They chose the limited, single-film circumstance. The circumstance of showing more than one objectionable film must, unfortunately, be litigated in another case unless, of course, the Majority Opinion stands.

(recognizing that the city's ordinance was content-based); *see also Alameda Books, Inc.*, 535 U.S. at 434 (stating that content-based regulations are presumptively invalid and are subject to strict scrutiny); *Id.* at 448 (Kennedy, J., concurring in judgment) (recognizing the inherent "fiction" in classifying adult-establishment zoning ordinances as "content-neutral"). That is, adult-establishment zoning ordinances are considered "content-neutral" *if* they are predominately concerned with combating negative secondary effects. Owing to their "content-neutral" status, *Young*- and *Renton*-type ordinances covering adult establishments are subject to a lesser scrutiny and are constitutionally valid provided that they are narrowly tailored to further the substantial governmental interest of regulating the pernicious secondary effects associated with adult establishments. *Alameda Books, Inc.*, 535 U.S. at 456 (Souter, J., dissenting).

**{61}** Here, as I have already noted, there were no negative secondary effects, nor were any anticipated from the Guild's single showing of an adult film. The City has failed to carry its evidentiary burden and there exists no evidence in the record of any likelihood of negative secondary effects in the Guild's neighborhood or elsewhere in the City if the Guild's singular activity were allowed. Additionally, the City provided no evidence showing why the Ordinance, as applied, furthered a substantial governmental interest. *See Renton*, 475 U.S. at 47. The City has not shown that the Ordinance affects "only that category of theaters shown to produce the unwanted secondary effects[.]" *Id.* at 52. Thus, the City has not shown, and cannot show, that the Ordinance, as applied to the Guild's single showing, is narrowly tailored to serve a substantial governmental interest in restricting the single showing to a zoning quarantined location. Therefore, the Ordinance, as applied to the Guild, did not, and cannot, pass *Renton*'s lesser scrutiny. As a result, the Ordinance must be considered content-based. Content-based ordinances are subject to strict scrutiny. *Alameda Books, Inc.*, 535 U.S. at 434.

**{62}** Of course, if the Ordinance, as applied to the Guild's single showing, cannot pass the *Renton* lesser scrutiny, the Ordinance clearly cannot pass constitutional muster under a strict scrutiny analysis. The City simply cannot show that the Ordinance, as applied to the Guild's single showing, is narrowly tailored to serve a compelling governmental interest in restricting the single showing to a zoning quarantined location. *See ACLU of N.M.*, 2006-NMCA-078, ¶ 19 (stating the government's burden under a strict scrutiny analysis).

**{63}** With regard to the lesser *Renton* scrutiny and to strict scrutiny, the City cannot reasonably contend that the Ordinance cannot be more narrowly tailored. The City knows how to narrowly tailor an ordinance. It has done so with respect to commercial establishments that provide pornographic material. After defining the whole gamut of "adult material" in Section 14-16-1-5(B) of the Ordinance, the Ordinance defines an "adult store" as "[a]n establishment having 25% or more of its shelf space or square footage devoted to the display, rental, sale[,] or viewing of adult material for any form of consideration." Albuquerque, N.M., Rev. Ordinances § 14-16-1-5(B). The Ordinance's silence as to stores having 24% or less of its shelf space or square footage devoted to adult material demonstrates that the Ordinance is narrowly tailored to allow stores to provide adult material

22

as long as certain shelf space or square footage restrictions are met. The narrow tailoring obviously applies, for example, to mainstream bookstores. On the other hand, the Ordinance's application to the Guild, a mainstream, single-screen art theater, lacks any narrow tailoring whatsoever. Accordingly, while the definition of "adult store" reflects the City's conclusion that an establishment that offers adult material for public consumption may do so without the likelihood of harmful secondary effects associated with adult amusement establishments so long as the adult material comprises less than one-fourth of the business's offerings, the City has made no attempt to apply that reasoning to adult amusement establishments.

**{64}** When questioned about this tailoring at oral argument, the City offered no plausible explanation as to why similar narrow tailoring could not be accomplished with respect to theaters such as the Guild. Counsel for the City posited that "there is a difference between buying . . . an erotic book and walking out of the store with it, and watching an erotic conduct with a group of people." Counsel provided no further explanation. The explanation did not touch on the question of negative secondary effects and there was no evidence to support the City's assertion. All that the City could muster further was that "[t]here just is" such a difference and that the "percentage" approach cannot be taken with respect to movies. Given that the City has conceded that "it's not the art-house theater's showing the single instance that the City is concerned about" and given that the City has produced no evidence of any likely negative secondary effects occurring in the future if the Guild is allowed its single showing on this occasion, I am unable to see how the City can narrowly tailor the Ordinance to allow certain adult stores to regularly and to some substantial degree provide adult material, yet find no way to do the same with regard to activity such as that of the Guild at issue here.

## Unproven Future Concerns

**{65}** Although the Guild cannot be considered an adult amusement establishment and the Ordinance cannot withstand constitutional scrutiny, I recognize there is some difficultly as a result of the parties' mal-construction of this case. By presenting a case of a single showing of one film, and nothing more, the parties have offered no particular limit on the showing of other adult films including the number of showings during any particular period of time. This opens up possibly legitimate governmental concerns about having to deal with expanded showings by the Guild and with the possibility of other, similar theaters popping up in the same or new neighborhoods showing one or more adult films. It leaves the City with the difficult task of writing a narrowly tailored ordinance that will survive constitutional scrutiny. At what point will an establishment come within the *Young* and *Renton* concept of an adult amusement establishment the existence of which, as the law seems now to stand, is presumed likely to create negative secondary effects?

**{66}** The closest the City comes to meeting these concerns is the City's statement in oral argument that "it's not the art-house theater's showing the single instance that the City is concerned about, it's the dynamic and broad issue that if they can do it, others can do it."

23

In oral argument, the City stated its concern to be that conduct which in its "aggregate . . . produce[s] negative secondary effects," and the City also indicated a "pragmatic" concern as to the difficulty in convicting beyond a reasonable doubt under a "regular and substantial course of conduct standard." In the district court proceedings, the court characterized the City as arguing that "the constitutional standards under which [the City's zoning ordinances] were passed and enforced, recognize a dynamic and broad view of land use conduct." Therefore, the City argued in the district court that there existed "no constitutional requirement that the City show a discrete secondary harmful effect from a single event." Yet, the City presented no evidence relating to any of these concerns. And the City has supplied no authority for or content to its general and formless theory that because zoning ordinances are "dynamic and broad" the Ordinance is justified.

{67}   By its vague "broad and dynamic" argument, the City appears to be saying that its zoning needs to be broad enough to reach and cover each and every future circumstance involving not only a single showing but incremental increases in showings of adult-content films. While I can appreciate the City's concerns, in the context of First Amendment rights and the lack of evidence in this case, the City's "broad and dynamic" theory is much too nebulous to carry the weight it must have to give the Ordinance a narrowly tailored status. It is noteworthy that the district court did not rely on this theory in its extensive decision, nor does the Majority Opinion affirm the district court on this theory.

{68}   In the balance of things, at one end of the pornographic film business spectrum, we have regular and substantial activity of an acknowledged sexual-oriented adult amusement establishment in the *Young* and *Renton* sense. At the other end, is a single showing by an acknowledged mainstream, independent, single-screen, neighborhood art theater. The First Amendment and Article II, Section 17 of the New Mexico Constitution do not permit the bright-line, all-inclusive zoning test and criminal ordinance coverage held valid by the Majority Opinion—held valid based on the illogic of presumed negative secondary effects attributable to the *Young* and *Renton* version of adult amusement establishments.[3] Instead, the City must specifically prove a reasonable and rational correlation between allowing the Guild's activity and likelihood that negative secondary effects in the neighborhood or elsewhere in the City will result. Short of that proof, for the Ordinance to survive it must be narrowly tailored so that it does not subject the Guild to criminal liability. The First Amendment and Article II, Section 17 of the New Mexico Constitution plainly override the broad land-use zoning theory advanced by the City.

_____

[3]   The district court commented that although, in an as-applied context, the court "does not believe that a single showing standard is per se constitutionally invalid, it is in an anomalous place along the continuum of single use to full blown adult establishment in the miasmic collection of adult use law."

## CONCLUSION

**{69}** The Ordinance and the Majority's view that it is constitutional as applied to the Guild, are based on a false premise that all theaters that feature a film having an emphasis on depiction of adult material can reasonably and unquestionably be considered adult amusement establishments and therefore subject to criminal prosecution. There exist two independent reasons for holding that the City cannot, pursuant to the Ordinance, criminally sanction the Guild. First, the Guild is not an adult amusement establishment in the common usage and understanding of the phrase and as contemplated by *Young* and *Renton*. And the Ordinance can and should, therefore, be narrowly construed to exclude the Guild's showing of a single film from its definition of an adult entertainment establishment.

**{70}** Second, if the Ordinance is nevertheless construed to apply to the Guild, it fails any applicable constitutional scrutiny. The Ordinance must be, but is not, narrowly tailored to further a compelling or substantial governmental interest, as applied to the Guild. No compelling or substantial governmental interest has been shown to exist for application of the Ordinance to the Guild. The Ordinance is, therefore, unconstitutional as applied to the Guild. The City is not precluded from engaging in the experimentation it is permitted under *Young*. *See Young*, 427 U.S. at 71 (stating that "the city must be allowed a reasonable opportunity to experiment with [zoning] solutions to admittedly serious problems"). Indeed, the City may well need to experiment further in order to find the narrow tailoring that constitutionally fits.

_____

**JONATHAN B. SUTIN, Judge**

**Topic Index for** *City of Albuquerque v. Pangaea Cinema, LLC*, **Docket No. 30,380**

**APPEAL AND ERROR**
Standard of Review

**CONSTITUTIONAL LAW**
Interstitial Analysis
New Mexico Constitution, General
Freedom of Speech
Notice
Prior Restraint
Vague or Overbroad

**GOVERNMENT**
Ordinances
Zoning Law

**STATUTES**

Interpretation
Legislative Intent